WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melissa Ann Jones, | No. CV-13-02078-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, | |
| Defendant. | |

Melissa Ann Jones (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1. For the following reasons, the Court affirms the Commissioner's disability determination.

**I.     Procedural Background**

In October 2010, Plaintiff applied for disability insurance benefits under Title II of the Act. 42 U.S.C. § 401-34. (Tr. 194.)[1] After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an administrative law judge (ALJ). (Tr. 69-106.) After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act. (Tr. 11-

---

[1] Citations to "Tr." are to the transcript of the certified administrative record. (Doc. 16.)

27.)   This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.) Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.     Medical Record

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health.   The record also includes opinions from State Agency Physicians who examined Plaintiff or reviewed the records related to her health, but who did not provide treatment.

### A.     Treatment Related to Plaintiff's Physical Health

Plaintiff injured her back while at work in 2006.  (Tr. 39-40, 310.)  After receiving other treatment, in February of 2008, Plaintiff began treatment for her back pain with Michael Winer, M.D.  (Tr. 310.)  He diagnosed lumbar disc herniation at lumbar level L2-3 and degenerative disc disease with annular tears at L4-5 and L5-S1.  (Tr 312.)  He recommended epidural injections, which Plaintiff completed with Michael Wolff, M.D., in early August 2008.  (Tr. 311, 312, 314.)  On April 2, 2008, Dr. Winer noted that Plaintiff was on "no work status."  (Tr. 314.)

In January 2009, Dr. Winer recommended an additional epidural injection, which Dr. Wolff administered.  (Tr. 318.)  At a follow-up appointment on February 16, 2009, Dr. Winer noted that the injection gave Plaintiff "significant" relief.  (*Id.*)  During that appointment, Dr. Winer also noted that Plaintiff was performing "light duty" work as an administrative assistant for twenty hours per week.  (*Id.*)  Dr. Winer stated that Plaintiff should increase her hours as her stamina improved.  (*Id.*)  On April 2, 2009, Dr. Winer increased Plaintiff's "work hours to six hours per day."  (Tr. 320.)  He noted that her "work status [was] no lifting over 15 [pounds], six hours maximum per day."  (*Id.*)  On May 7, 2009, Dr.Winer increased the duration of Plaintiff's work status to six to eight hours per day.  (*Id.*)

On June 15, 2009, Physician Assistant (PA) Gretchen Post from Dr. Wolff's office completed a "Patient Work Status Form," indicating that Plaintiff could lift, push, or pull up to ten pounds, and should avoid repetitive stooping, bending, twisting, turning, or awkward positioning. (Tr. 300.) She also noted that Plaintiff could work four to six hours per day per week. (*Id.*)

Plaintiff continued complaining of pain, and Dr. Wolff performed a lumbar nerve ablation on January 15, 2010. (Tr 273.) PA Post noted that Plaintiff had some improvement after the nerve ablation and assessed a work status limiting Plaintiff to lifting, carrying, pushing, or pulling less than ten pounds, and no repetitive bending, twisting, turning, lifting, or awkward positioning. (Tr. 271.) She also stated that Plaintiff should "take 1-2 minute breaks every 30 minutes for position changes and/or stretching pm." (*Id.*)

Plaintiff saw Dr. Winer again in June 2010. (Tr. 322.) He determined that Plaintiff should receive supportive care for her back including physical therapy, injections, and diagnostic work as needed. (*Id.*) He noted that Plaintiff's work status was "light duty" work on a part-time basis. (*Id.*) Plaintiff continued to report back pain in 2010 and sought treatment from Dr. Steven Sardo. (Tr. 388.) He noted that Plaintiff was an "excellent candidate for a repeat epidural as she [had] responded quite well in the past." (Tr. 390.) On referral from Dr. Sardo, in September and October 2010, Plaintiff had lumbar and sacral nerve blocks. (Tr. 392, 394.) Plaintiff had additional nerve blocks in February, April, and November 2011. (Tr. 612, 616, 708.) She had a nerve ablation in May 2011. (Tr. 614.)

In the meantime, on October 29, 2009, Plaintiff was examined by Dr. Paul Palmer in connection with her worker's compensation claim. (Tr. 689.) Dr. Palmer examined Plaintiff and reviewed her medical records. (Tr. 689-704.) He opined that Plaintiff could perform "light duty" work including lifting up to fifteen pounds maximum and lifting ten pounds repetitively. (Tr. 703.) He also found that Plaintiff should avoid repetitive

1     lifting, bending or stooping, prolonged sitting or standing, and found that she frequently

2     needed to change positions.  (*Id.*)

3        In March 2011, Plaintiff was examined by State Agency Physician Julie Ramos,

4     M.D.  (Tr. 592.)  Dr. Ramos reviewed a 2010 CT scan of Plaintiff's brain, a 2011 x-ray

5     report, a 2006 progress note from Dr. Winer, an April 2010 physical therapy note, a

6     report from the Arizona Neurological Institute, and a 2010 cardiology consult.  (Tr. 592.)

7     On examination, Dr. Ramos noted that Plaintiff could tandem walk, toe walk, and squat.

8     (Tr. 594.)  Dr. Ramos reported that Plaintiff had a normal range of motions in all joints,

9     full muscle strength in her upper and lower extremities, and normal muscle tone and bulk

10     in all extremities.  (*Id.*)  Plaintiff was unable to heel walk and had a positive straight leg

11     test in a seated and supine position on the left.  (*Id.*)  Dr. Ramos diagnosed "lower back

12     pain due likely to paravertebral muscle spasm without neurologic or functional

13     impairment," and opined that Plaintiff would not have an impairment lasting twelve

14     months.  (Tr. 595.)

15        **B.**     **Treatment Related to Plaintiff's Mental Health**

16        In September 2009, Plaintiff began treatment at Southwest Behavioral Health

17     (Southwest) for depression.  (Tr. 372.)  Plaintiff received a psychiatric evaluation in

18     November 2009, which indicatef that she had limited insight and judgment, and intact

19     concentration and memory.  (Tr. 345.)  On April 9, 2011, a medical provider at

20     Southwest diagnosed Plaintiff with bipolar disorder and panic disorder.  (Tr. 648.)  On

21     December 12, 2011, Nurse Practitioner (NP) Sharon Paul completed a residual functional

22     capacity (RFC) assessment.  (Tr. 655.)  She opined that Plaintiff had no limitations in her

23     abilities to understand and remember "short, simple" or detailed instructions, carry out

24     "short, simple" instructions, and make judgments on simple work-related decisions.

25     (Tr. 654.)  She found that Plaintiff had slight limitations in her ability to respond to

26     changes in a work setting.  (Tr. 655.)  She opined that Plaintiff had moderate limitations

27     in her ability to interact with the public, co-workers, and supervisors, and marked

28     limitations in her ability to respond to work pressures.  (*Id.*)

1    On April 3, 2011, State Agency Physician Jacqueline Worsley, M.D., conducted a
2  psychological examination of Plaintiff in which she examined Plaintiff and reviewed the
3  medical record.   (Tr. 596.)   Dr. Worsley diagnosed Plaintiff with mood and panic
4  disorders.   (Tr. 598.)   She opined that Plaintiff "may have difficulties maintaining a
5  regular work schedule," that "her symptoms could interrupt her work performance," that
6  she "could be expected to have conflicts with supervisors and co-workers," and "she may
7  not always respond appropriately to workplace changes."  (Tr. 599.)

8  **III.    Administrative Hearing Testimony**

9    Plaintiff was in her thirties at the time of the administrative hearing and lived with
10  her parents.  (Tr. 37.)  She had a high school education, had taken some college courses,
11  and had her real estate certificate.   (Tr. 37-38.) Plaintiff's past relevant work included
12  customer service representative, sales clerk, office manager, and auditing clerk.  (Tr. 58-
13  59.)  Plaintiff testified that she last worked as a receptionist for an insurance company
14  and that job ended in October 2009 when the company closed.  (Tr. 40-41.)  She then
15  received unemployment compensation and looked for work.  (Tr. 40, 50.)

16    Plaintiff stated that in 2006 she injured her back and had a worker's compensation
17  claim.  (Tr. 39, 43.)  She testified that she had constant low back pain that radiated into
18  her legs.  (Tr. 46-47.)  She stated that she could not sit or stand longer then fifteen
19  minutes without needing to change position, and that she could not walk more than ten
20  minutes without needing to sit.  (Tr. 49.)  She also testified that she could lift up to ten
21  pounds.  (*Id.*)  Plaintiff further testified that she had anxiety, depression, bipolar disorder,
22  and mood disorder.  (Tr. 51.)  She reported that she took medication that interfered with
23  her memory and concentration.  (Tr. 52-53.)  Plaintiff testified that she could not perform
24  household chores due to fatigue, and that she was unable to drive.  (Tr. 54.)

25    The ALJ concluded that Plaintiff retained the RFC to perform "sedentary work,"
26  except that she could not "climb ladders, ropes or scaffolds, but [could] perform
27  occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, and
28  crawling."   (Tr. 15.)   The ALJ further found that Plaintiff was limited to "simple,

1   unskilled work with occasional interaction with the public and coworkers," and that she

2   could "only perform occasional decision making and [could] handle only occasional

3   changes in the work setting."  (*Id.*)  Vocational expert Ruth Arnish testified that an

4   individual with the RFC assessed by the ALJ could perform work that existed in

5   significant numbers in the national economy.  (Tr. 59-61.)

6   **IV.   The ALJ's Decision**

7          A claimant is considered disabled under the Social Security Act if she is unable

8   "to engage in any substantial gainful activity by reason of any medically determinable

9   physical or mental impairment which can be expected to result in death or which has

10  lasted or can be expected to last for a continuous period of not less than 12 months."

11  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard

12  for supplemental security income disability insurance benefits).  To determine whether a

13  claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See*

14  20 C.F.R. §§ 404.1520, 416.920.

15         **A.     Five-Step Evaluation Process**

16         In the first two steps, a claimant seeking disability benefits must initially

17  demonstrate (1) that she is not presently engaged in a substantial gainful activity, and

18  (2) that her impairment or combination of impairments is severe.    20 C.F.R.

19  § 404.1520(a)(4)(i) and (ii).  If a claimant meets steps one and two, she may be found

20  disabled in two ways at steps three through five.  At step three, she may prove that her

21  impairment or combination of impairments meets or equals an impairment in the Listing

22  of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R.

23  § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ

24  determines the claimant's RFC.   20 C.F.R. § 404.1520(e).   At step four, the ALJ

25  determines whether a claimant's RFC precludes her from performing her past work.

26  20 C.F.R. §  404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the

27  burden shifts to the government at step five to establish that the claimant can perform

28  other jobs that exist in significant number in the national economy, considering the

claimant's RFC, age, work experience, and education.  20 C.F.R. § 1520(a)(4)(v).  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

**B.  The ALJ's Application of the Five-Step Evaluation Process**

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 4, 2008, the alleged disability onset date.  (Tr. 13.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "bipolar disorder; depression; anxiety; mood disorder; disorder of the back; and obesity (20 C.F.R. § 404.1520(c))."  (*Id.*)  At the third step, the ALJ found that the severity of those impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four, the ALJ found that Plaintiff could not perform her past relevant work.  (Tr. 25.)  However, the ALJ found that considering Plaintiff's "age, education, work experience, and [RFC]," she could perform other work that existed in significant numbers in the national economy.  (Tr. 26.)  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (Tr. 27.)

**V.  Standard of Review**

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as

1     adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

2     (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).   In

3     determining whether substantial evidence supports a decision, the court considers the

4     record as a whole and "may not affirm simply by isolating a specific quantum of

5     supporting evidence."   *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

6     quotation and citation omitted).

7         The ALJ is responsible for resolving conflicts in testimony, determining

8     credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

9     Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

10    interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

11    *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

12 **VI.     Plaintiff's Claims**

13         Plaintiff claims that the ALJ misinterpreted some of the evidence in the record,

14    and that he did not give legally sufficient reasons for rejecting the treating and examining

15    medical source opinions.  (Doc. 19 at 2.)  The Commissioner responds that the ALJ's

16    decision is free from legal error and supported by substantial evidence in the record.

17    (Doc. 20.)

18        **A.      The ALJ Did Not Misinterpret the Record**

19         Plaintiff asserts that the ALJ misinterpreted Dr. Worsley's opinion, the basis for

20    Dr. Palmer's opinion that Plaintiff needed to frequently change positions, and the medical

21    source responsible for establishing Plaintiff's work status on June 15, 2009 and January

22    28, 2010.  (Doc. 19 at 6-7.)  As discussed below, the ALJ did not misinterpret this

23    evidence.

24            **1.      Dr. Worsley's Opinion**

25         Plaintiff first argues that, although the ALJ gave Dr. Worsley's April 2011 opinion

26    great weight, his RFC did not account for the limitations that Dr. Worsley identified.

27    (Doc. 19 at 6.)  Plaintiff contends that "when the actual limitations were given to the

28

1   vocational expert at hearing, that expert indicated that such an individual would be unable

2   to sustain competitive employment." (Doc. 19 at 6 (citing Tr. 65).)

3         On a Psychological/Psychiatric Medical Source Statement, Dr. Worsley opined

4   that Plaintiff had "the ability to understand and recall information with little difficulty."

5   (Tr. 599.) She also opined that Plaintiff "may have difficulties with being punctual or

6   maintaining a regular schedule," and that "[h]er symptoms could interrupt her work

7   performance, especially when it comes to dealing with others and how she responds."

8   (*Id.*) Dr. Worsley also found that Plaintiff "could be expected to have conflicts with

9   supervisors and coworkers, especially if given constructive criticism," and that "she

10  comes across as a somewhat angry unapproachable individual." (*Id.*) She further found

11  that Plaintiff "may not always respond appropriately to workplace changes if they trigger

12  anxiety or anger. She may rely on medication to handle such changes." (*Id.*)

13        The ALJ's RFC was consistent with that opinion, which he gave "greater weight."

14  (Tr. 23.) Specifically, the RFC limited Plaintiff to simple, unskilled work, occasional

15  interaction with the public and co-workers, occasional decision-making, and occasional

16  changes in the work setting. (Tr. 15.) This RFC sufficiently accounts for the limitations

17  Dr. Worsley identified.

18        Relying on a hypothetical question that her attorney asked the vocational expert

19  during the administrative hearing, Plaintiff characterizes Dr. Worsley's Medical Source

20  Statement as finding Plaintiff moderately limited in interacting with the public and

21  supervisors, and markedly restricted in responding appropriately to work pressures.[2]

22  (Tr. 19 (citing Tr. 65).) Dr. Worsley, however, did not identify those limitations.

23  (Tr. 599.) For example, Dr. Worsley opined that Plaintiff "*may* not always respond

24  appropriately to workplace changes if they trigger anxiety or anger." (*Id.*) (emphasis

25  added.) A finding that Plaintiff "may" be limited in her ability to respond to changes in

26  the work setting does not translate into a marked limitation in that ability. Similarly,

27  _____

28       [2] As Plaintiff notes, the vocational expert testified that an individual with all of those limitations would be precluded from all work. (Tr. 65.)

1    Dr. Worsley opined that Plaintiff "could be expected to have conflicts with supervisor

2    and coworkers," but did not opine that Plaintiff was moderately limited in her ability to

3    interact with the public and supervisors.  (*Id.*)  Additionally, Dr. Worsley did not provide

4    any opinion regarding Plaintiff's ability to respond to work pressures.  (*Id.*)

5         In sum, the ALJ's RFC was consistent with Dr. Worsley's opinion.  (*Compare*

6    Tr. 15 *with* Tr. 599.)  Additionally, the ALJ asked the vocational expert a hypothetical

7    question that included those limitations (Tr. 62), and she responded that a person with

8    those limitations could perform work as an addresser, product finisher, and glass waxer.

9    (Tr. 60-61.)  The ALJ relied on that testimony to find Plaintiff not disabled.[3]  (Tr. 27.)

10   The Court rejects Plaintiff's assertion that the ALJ misinterpreted Dr. Worsley's opinion.

11               **2.    Dr. Palmer's Opinion**

12        Plaintiff next argues that the ALJ misinterpreted the basis for Dr. Palmer's opinion

13   that Plaintiff needed to change position frequently.  (Doc. 19 at 7.)  On October 29, 2009,

14   Dr. Palmer, an independent medical examiner, examined Plaintiff for her worker's

15   compensation claim.  (Tr. 19, 689.)  Among other things, he opined that Plaintiff

16   "need[ed] change of position frequently."  (Tr. 703.)  The ALJ rejected that opinion

17   because, other than Plaintiff's subjective complaints, there was "scant evidence . . . of

18   any need to change position."[4]  (Tr. 25.)

19        During her examination with Dr. Palmer, Plaintiff provided a history of back

20   injury and medical conditions.  (Tr. 689.)  Dr. Palmer noted that Plaintiff "report[ed] that

21   the pain in her back [was] aggravated by sitting more than 15 minutes, standing 15 to 20

22   minutes, and walking over 20 minutes."  (Tr. 691.)  Dr. Palmer also noted that he

23   observed Plaintiff sit in the waiting area for twenty minutes "without any distress."  (*Id.*)

24

25        [3]  Although the ALJ misstated the job titles as "[d]resser," "[p]olish finisher," and
     "[g]lass blaster," he identified the jobs that Plaintiff could perform by the DOT numbers
26   that the vocational expert used at the administrative hearing.  (DOT 209.587-101, DOT
     731.687-014, and DOT 779.687-038).  (*Compare* Tr. 60-61 *with* Tr. 27.)

27        [4]  Plaintiff asserts that the ALJ erred in his apparent assumption that Dr. Palmer
     was biased in favor of accepting Plaintiff's subjective complaints.  Plaintiff argues that if
28   Dr. Palmer had any bias, it was in favor of the "industrial insurance carrier who wishe[d]
     to limit its liability on the worker's compensation case."  (Doc. 19 at 7.)

1    Dr. Palmer's report also summarized the medical record, but his summary does not

2    include any information stating that Plaintiff needed to change position frequently.

3    (Tr. 692-703.)   Because Dr. Palmer's report includes a discussion of Plaintiff's self-

4    reported need to change positions, but does not identify any medical records that discuss

5    Plaintiff's need to change position, the ALJ did not err by concluding that Dr. Palmer's

6    opinion about Plaintiff's need to change position was based on Plaintiff's subjective

7    complaints.[5]

8                          **3.      Work Status Opinions**

9           Plaintiff next asserts that because a treatment note from PA Post at Dr Wolff's

10   office states that Plaintiff's "work status assessed by the doctor's office was per

11   Dr. Winer (Tr. 295) . . . , one must assume that the limitations set out in June of 2009

12   (Tr. 300) and in January of 2010 (Tr. 271) were set in conjunction with the opinion of

13   Dr. Winer."  (Doc. 19 at 7.)   Although Plaintiff does not clearly explain this claim, it

14   appears related to her later claim that the ALJ erred by failing to consider PA Post's June

15   15, 2009 and January 28, 2010 opinions regarding Plaintiff's work status as a treating

16   physician's opinions.  (Doc. 19 at 8.)

17          On January 15, 2009, PA Post stated in a treatment note "work status: per

18   Dr. Winer."  (Tr. 295.)  That treatment note does not otherwise describe Plaintiff's work

19   status or her functional limitations.   (*Id.*)   On June 15, 2009, PA Post completed a

20   "Patient Work Status" form specifically identifying Plaintiff's functional limitations.

21

22   _____

     [5]   The ALJ found Plaintiff's subjective complaints "less than fully credible."
     (Tr. 16.)  Plaintiff does not challenge the ALJ's credibility determination.  (Doc. 19)  On

23   review of the record, the Court finds that the ALJ gave legally sufficient reasons to
     support his credibility determination.    (Tr. 16-17.)    Thus, because the ALJ properly

24   discredited Plaintiff's subjective complaints, he did not err by rejecting Dr. Palmer's
     opinion, which was based on those complaints.  *See Bray v. Comm'r Soc. Sec. Admin.*,

25   554 F.3d 1219, 1228 (9th Cir. 2009) (An ALJ properly discounts a physician's opinion
     that is based on claimant's self-reporting if the ALJ concludes that claimant's self-

26   reporting is not credible); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)
     (rejecting physician's opinion in part because it was based on claimant's subjective

27   complaints, not on new objective findings); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
     (9th Cir. 2001) (medical opinion premised on subjective complaints may be disregarded

28   where record supports ALJ in discounting claimant's credibility).

1   (Tr. 300.)  That form does not attribute the opinion regarding Plaintiff's work status or

2   functional limitations to Dr. Winer.  (*Id.*)  On January 28, 2010, PA Post prepared a

3   treatment note, which again described Plaintiff's functional limitations.  (Tr. 271.)  That

4   treatment note does not attribute those findings to Dr. Winer.  (*Id.*)

5       Although PA Post's January 2009 treatment note indicates that Dr. Winer

6   established Plaintiff's work status at that time, her June 2009 work status form and

7   January 2010 treatment note do include such an attribution.  Accordingly, the ALJ

8   reasonably attributed those opinions to their author, PA Post, and not to Dr. Winer.

9           **B.      The ALJ Properly Weighed Opinion Evidence**

10      Plaintiff next argues that the ALJ erred by rejecting the opinions of treating and

11  examining medical sources.  (Doc. 19 at 7-10.)  In weighing medical source evidence, the

12  Ninth Circuit distinguishes between three types of physicians: (1) treating physicians,

13  who treat the claimant; (2) examining physicians, who examine but do not treat the

14  claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.

15  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a

16  treating physician's opinion.  *Id*.  The ALJ must provide clear and convincing reasons

17  supported by substantial evidence for rejecting a treating or an examining physician's

18  uncontradicted opinion.  *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An

19  ALJ may reject the controverted opinion of a treating or an examining physician by

20  providing specific and legitimate reasons that are supported by substantial evidence in the

21  record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at

22  725.

23      Opinions from non-examining medical sources are entitled to less weight than

24  treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally

25  gives more weight to an examining physician's opinion than to a non-examining

26  physician's opinion, a non-examining physician's opinion may nonetheless constitute

27  substantial evidence if it is consistent with other independent evidence in the record.

28  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical

opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  The Court considers Plaintiff's claims regarding the weight the ALJ assigned to the medical source and other source opinions in light of these standards.

### 1.    Treating Physician Dr. Winer

Plaintiff contends that the ALJ erred by rejecting Dr. Winer's April 2008 opinion that Plaintiff could not work.[6]  (Doc. 19 at 8.)  The ALJ assigned "no weight" to Dr. Winer's opinion that Plaintiff was on "no work status" because it was inconsistent with Plaintiff's testimony and her abilities noted in the record.  (Tr. 24; *see* Tr. 314).  The ALJ specifically noted that Plaintiff cared for her daughter during that time period. (Tr. 24.)  He also noted that Plaintiff worked part-time during the period that Dr. Winer indicated that Plaintiff could not work.  (*Id.*)

Plaintiff does not dispute that she cared for her daughter at the time of Dr. Winer's 2008 opinion and substantial evidence in the record supports the ALJ's conclusion that Plaintiff cared for her daughter at the time of Dr. Winer's opinion.  (Doc. 19 at 7-8, Tr. 55, 220, 242.)  The ALJ did not err by discounting Dr. Winer's opinion that Plaintiff could not work as inconsistent with evidence that Plaintiff cared for her minor daughter. *See Tucker v. Comm'r Soc. Sec. Admin.* 2014 WL 3615493, at *8 (E.D. Cal. Jul. 21, 2014) (ALJ did not err in giving little weight to treating physician's opinion that was inconsistent with Plaintiff's reported ability to care for herself and her minor children).

Additionally, the ALJ relied on evidence that Plaintiff was working part-time in April 2008 to discount Dr. Winer's opinion that Plaintiff could not work.  The ALJ did not err in discounting this opinion because substantial evidence supports his conclusion that Plaintiff was working at the time of Dr. Winer's opinion.  (Tr. 180.)  An ALJ may

---

[6]   As the Commissioner notes (Doc. 20 at 12), the ALJ's decision mistakenly states that Dr. Winer's opinion was issued in April 2009.  (Tr. 24.)

properly reject a medical opinion if it is inconsistent with a plaintiff's demonstrated abilities, *see Magallanes*, 881 F.2d at 751-52, and Plaintiff's ability to work part-time calls into question Dr. Winer's "no work" assessment. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-02 (9th Cir. 1999) (upholding the rejection of a physician's conclusion that the claimant suffered from marked limitations in part based on other evidence of the claimant's ability to function, including reported activities of daily living, that contradicted that conclusion); *Potter v. Astrue*, 2009 WL 267713, at *8 (C.D. Cal. Aug. 27, 2009) (upholding ALJ's rejection of treating physician's opinion based on the plaintiff's ability to work and attend school).

The record contains evidence of Plaintiff's earnings the first two quarters of 2008 (Tr. 180), which coincides with the date of Dr. Winer's April 2008 opinion. Plaintiff correctly notes that she had no earnings records for 2009. (Doc. 19 at 8 (citing Tr. 180).) However, her earnings records in 2009 are not relevant to Dr. Winer's 2008 opinion. Additionally, even if Plaintiff's earnings in 2008 were less than "substantial," as Plaintiff argues (Doc. 22 at 1-2), she does not cite any authority to support the proposition that, to be considered inconsistent with a medical source's opinion regarding a claimant's functional limitations, work activity must be considered "substantial" under the regulations.[7] Thus, the ALJ provided legally sufficient reasons for rejecting Dr. Winer's 2008 opinion and those reasons are supported by substantial evidence in the record.

### 2.    The ALJ Properly Considered PA Post an "Other Source"

Plaintiff next contends that the ALJ erred by considering PA Post a non-acceptable medical source, and argues that the she should have been considered an acceptable medical source.[8] (Doc. 19 at 8) (citing *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir.

---

[7]  Section 20 C.F.R. § 416.972 defines substantial and gainful work activity.

[8]  Only licensed physicians and certain other qualified specialists are considered "[a]cceptable medical sources." 20 C.F.R. § 404.1513(a). These are limited to licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Physician assistants and nurse practitioners are defined as "other sources," § 404.1513(d), and are not entitled to the same deference, *see* § 404.1527; SSR 06–03p.

1996)).  In *Gomez*, the Ninth Circuit found, based on a regulation that was later repealed, (20 C.F.R. § 416.913(a)(6)), that a nurse practitioner's opinion was properly considered as an opinion of an acceptable medical source when chart notes indicated that the nurse practitioner regularly consulted with the treating physician, was closely supervised by the treating physician, and acted as an agent of treating physician.  *Gomez,* 74 F.3d at 970-71. PA Post worked at Southwest Spine and Sports where Dr. Wolff worked.  To support her argument that PA Post should have been considered an acceptable medical source, Plaintiff asserts that "Dr. Wolff administered all the injections and did the nerve ablation on Plaintiff," but does not describe or cite to any evidence of the working relationship between Dr. Wolff and PA Post.  (Doc. 19 at 8.)

Furthermore, the Ninth Circuit has stated that *Gomez* may have been superseded by regulation.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2014) (declining to address *Gomez's* "continued vitality" because it did not directly apply to the case). However, even if *Gomez* remains good law, the exception stated in that case does not apply here because there is no evidence that PA Post regularly consulted with, was closely supervised by, or was an agent of Dr. Wolff.  (Tr. 263-308); *see Taylor v. Comm'r Soc. Sec.* 659 F.3d 1228, 1234 (9th Cir. 2011) (stating that to the extent that the nurse practitioner was working closely with, and under the supervision of, the treating physician her opinion should be considered that of an "acceptable medical source"); *Buck v. Astrue*, 2010 WL 2650038, *15 (D. Ariz. Jul. 1, 2010) (noting that in the case of an agency relationship with an "acceptable medical source," evidence from an "other source" may be ascribed to the supervising "acceptable medical source"); *Ramirez v. Astrue*, 2011 WL 1155682, at *4 (C.D. Cal. Mar. 29, 2011) (finding that physician's co-signature on patient plan prepared by a social worker did not indicate that the physician closely supervised the social worker's treatment of the claimant or preparation of the reports, thus the social worker's evaluation could not be attributed to an "acceptable medical source"); *Vasquez v. Astrue*, 2009 WL 939339, at *6 n.3 (E.D. Wash. Apr. 3, 2009) (finding that physician assistant's report "signed off" by a superior did not

1    constitute an "acceptable medical source" opinion).  Accordingly, the ALJ did not err by

2    considering PA Post an "other source," as opposed to an acceptable medical source.

3                    **3.    The ALJ Properly Considered NP Paul an "Other Source"**

4          Next, Plaintiff contends that the ALJ should have considered NP Paul an

5    acceptable medical source because she had a "doctorate."  (Doc. 19 at 9.)  The record

6    reflects that NP Paul was a Doctor of Nursing Practice and was a psychiatric nurse

7    practitioner.  (Tr. 655.)  Although NP Paul was a Doctor of Nursing Practice, that alone

8    does not qualify her as an acceptable medical source.  Only licensed physicians and

9    certain other qualified specialists are considered "[a]cceptable medical sources."  *See* 20

10   C.F.R. § 404.1513(a).  These other qualified specialists are limited to licensed or certified

11   psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language

12   pathologists.  *Id*  Physician assistants and nurse practitioners are defined as "other

13   sources."  20 C.F.R. § 404.1513(d).  Plaintiff has not provided any evidence indicating

14   that NP Paul was a licensed physician or qualified specialist under the regulations.

15   Accordingly, the ALJ properly considered her as an "other source."

16                    **4.    The ALJ Properly Considered the "Other Source" Opinions**

17         The ALJ properly considered PA Post and NP Paul "other sources."  Therefore,

18   pursuant to SSR 06-03p, 2006 WL 2329939, the ALJ was required to consider their

19   opinions and to give reasons germane to each witness for discounting their opinions.  *See*

20   *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 694 (9th Cir. 1993) (quoting

21   *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) (stating that when an ALJ rejects

22   evidence from "other medical sources," the ALJ "must give reasons that are germane to

23   each witness.")).

24         Here, the ALJ considered the opinions of PA Post and NP Paul.  (Tr 23-24.)  He

25   explained that he accorded their opinions "little weight" because they were inconsistent

26   with the record and were based upon Plaintiff's subjective complaints, which the ALJ

27   discounted.  (*Id.*)  These reasons are germane to the witnesses and sufficient for assigning

28   their opinions less weight.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005)

1   ("[i]nconsistency with medical evidence" is a germane reason for discrediting lay
2   testimony).

3   **VII.   Conclusion**

4        The ALJ did not misinterpret the record, he properly considered Physician
5   Assistant Post and Nurse Practitioner Paul "other sources," and he gave legally sufficient
6   reasons for the weight he assigned to the medical opinion and other source evidence.
7   Therefore, the Court concludes that the ALJ's opinion is supported by substantial
8   evidence in the record and any legal errors are harmless.

9        Accordingly,

10        **IT IS ORDERED** that the Commissioner's disability determination in this case is
11   **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the
12   Commissioner and against Plaintiff and to terminate this action.

13        Dated this 23rd day of September, 2014.

14

15

16                               _____
17                                 Bridget S. Bade
18                          United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28